ACCEPTED
04-14-00540-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
2/6/2015 9:52:10 AM
KEITH HOTTLE
CLERK

NO. 04-14-00540-CV

IN THE COURT OF APPEALS FOR THE
FOURTH COURT OF APPEALS DISTRICT
SAN ANTONIO, TEXAS

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
02/6/2015 9:52:10 AM
KEITH E. HOTTLE
Clerk

LEVI AND MICHELLE MCKENZIE

*Appellants*

v.

COMMUNITY NATIONAL BANK

*Appellee*

*On Appeal from the 38th Judicial District Court*
*Medina County, Texas*
*The Hon. Camile G. Dubose, Presiding*

## BRIEF OF APPELLEE

LAW OFFICES OF ELIZABETH G. SMITH
Elizabeth G. Smith
State Bar No. 18577200
6655 First Park Ten, Suite 250
San Antonio, Texas 78213
(210) 731-9177 – Telephone
(210) 731-9130 – Fax
beth@egsmithlaw.com

HOUSTON DUNN, PLLC
Nissa M. Dunn
State Bar No. 14766450
4040 Broadway St., Suite 440
San Antonio, Texas 78209
(210) 775-0880 – Telephone
(210) 826-0075 – Fax
nissa@hdappeals.com

ATTORNEYS FOR APPELLEE
COMMUNITY NATIONAL BANK

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................... ii

INDEX OF AUTHORITIES ............................................................................... iii

STATEMENT OF THE CASE .............................................................................. vi

ISSUES PRESENTED ...................................................................................... vi

STATEMENT OF FACTS ................................................................................... 1

SUMMARY OF THE ARGUMENT ...................................................................... 4

ARGUMENT AND AUTHORITIES ...................................................................... 6

    I.     The McKenzies' negligence claims are barred by the economic loss rule and estoppel by contract. ........................... 6

          *A.*    *Economic Loss Rule* ....................................................... 7

          *B.*    *Estoppel by Contract* ..................................................... 8

    II.    The absence of a special relationship between CNB and the McKenzies precludes imposition of an implied duty of good faith and fair dealing. ...................................................... 10

    III.   CNB's purported "partial disclosures" were neither material nor misleading, and as a matter of law, cannot support their fraudulent inducement claim. ........................... 12

PRAYER ..................................................................................................... 18

CERTIFICATE OF COMPLIANCE ..................................................................... 18

CERTIFICATE OF SERVICE .............................................................................. 19

APPENDIX

    Order Granting Community National Bank's No Evidence Motion for Summary Judgment and Traditional Motion for Summary Judgment (signed May 5, 2014) ........................................... A

    Excerpts from McKenzie Loan Documents .......................................... B

# INDEX OF AUTHORITIES

## Cases

*Anderson, Greenwood & Co. v. Martin,*
44 S.W.3d 200 (Tex.App. – Houston [14th Dist.] 2001, pet. denied) ..... 13

*Bradford v. Vento,*
48 S.W.3d 749 (Tex. 2001) ................................................................6, 13

*Browning's Adm'x v. Atkinson,*
37 Tex. 633 (1872).................................................................................9

*Dillee v. Sisters of Charity of Incarnate Word Health Care Sys., Houston, Tex.,*
912 S.W.2d 307 (Tex.App. – Houston [14th Dist.] 1995, no writ) ........... 12

*English v. Fisher,*
660 S.W.2d 521 (Tex. 1983) ................................................................ 10

*Equistar Chem., L.P. v. Dresser-Rand Co.,*
240 S.W.3d 864 (Tex. 2007).................................................................8

*Express One Int'l, Inc. v. Steinbeck,*
53 S.W.3d 895 (Tex.App. – Dallas 2001, no pet.) ..................................... 7

*Fasken Land & Minerals, Ltd. v. Occidental Permian Ltd.,*
225 S.W.3d 577 (Tex.App. – El Paso 2005, pet. denied) .......................... 9

*Federal Deposit Ins. Corp. v. Coleman,*
795 S.W.2d 706 (Tex. 1990)................................................................. 10

*Fleming v. Tex. Coastal Bank of Pasadena,*
67 S.W.3d 459
(Tex.App. – Houston [14th Dist.] 2002, pet. denied) ...................15, 16, 17

*GJP, Inc. v. Ghosh,*
251 S.W.3d 854 (Tex.App. – Austin 2008, no pet.) ................................ 14

*Hawkins v. Campbell,*
226 S.W.2d 891 (Tex.Civ.App. – San Antonio 1950, writ ref'd n.r.e.) ..... 14

*Hawn v. Hawn,*
  574 S.W.2d 883 (Tex.Civ.App. – Eastland 1978, writ ref'd n.r.e.) .............8

*Holland v. Thompson,*
  338 S.W.3d 586 (Tex.App. – El Paso 2010, pet. denied) ..........................6

*Holley v. Central Auto Parts,*
  347 S.W.2d 341 (Tex.Civ.App. – Austin 1961, writ ref'd n.r.e.) ............... 14

*In re Lyon Fin. Serv., Inc.,*
  257 S.W.3d 228 (Tex. 2008) ...................................................................11

*Ins. Co. of N. Am. v. Morris,*
  981 S.W.2d 667 (Tex. 1998) .................................................................. 12

*Int'l Sec. Life Ins. Co. v. Finck,*
  475 S.W.2d 363 (Tex.Civ.App. – Amarillo 1971),
  *rev'd on other grounds,* 496 S.W.2d 544 (Tex. 1973) ............................... 7

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of America,*
  341 S.W.3d 323 (Tex. 2011).................................................................... 14

*Jeffcoat v. Phillips,*
  534 S.W.2d 168 (Tex.Civ.App. – Houston [14th Dist.] 1976, writ ref'd
  n.r.e.).................................................................................................. 14

*Jim Walter Homes, Inc. v. Reed,*
  711 S.W.2d 617 (Tex. 1986) .................................................................... 7

*Johnson v. Structured Asset Serv., LLC,*
  148 S.W.3d 711 (Tex.App. – Dallas 2004, no pet.)....................................8

*Jones Partners Constr., LLC v. Apopka Plaza Assoc., LLC,*
  2006 WL 784892 (N.D.Tex 2006),
  *aff'd,* 227 Fed.App'x. 420 (5th Cir. 2007) ............................................... 13

*Leeder v. Wells Fargo Bank N.A.,*
  No. 04-13-00380-CV, 2014 WL 1714080
  (Tex.App. – San Antonio Apr. 30, 2014, no pet.) (mem. op.)................ 6, 7

*Nabors Drilling, U.S.A., Inc. v. Escoto,*
  288 S.W.3d 401 (Tex. 2009) .................................................................... 6

*Nat'l Prop. Holdings, L.P. v. Westergren,*
  58 Tex.S.Ct.J. 204, 2015 WL 123099 (Tex. 2015) ....................................... 5

*Nationsbank v. Perry Bros. Inc.,*
  68 F.3d 466 (5th Cir. 1995) (not designated for publication) ................... 11

*Ralston Purina Co. v. McKendrick,*
  850 S.W.2d 629 (Tex.App. – San Antonio 1993, writ denied) .......... 1, 7, 13

*Skinner Custom Homes, Inc. v. Smith,*
  397 S.W.3d 841 (Tex.App. – El Paso 2013, pet. denied) ............................ 8

*Southwestern Bell Tel. Co. v. DeLanney,*
  809 S.W.2d 493 (Tex. 1991) ....................................................................... 7

*Strauss v. Ford Motor Co.,*
  439 F.Supp.2d 680 (N.D.Tex. 2006) .......................................................... 7

*Stuebner Realty 19, Ltd. v. Cravens Rd. 88, Ltd.,*
  817 S.W.2d 160 (Tex.App. – Houston [14th Dist.] 1991, no writ) .............. 9

*Tarrant Cnty. Hosp. Dist. v. GE Auto. Serv., Inc.,*
  156 S.W.3d 885 (Tex.App. – Fort Worth 2005, no pet.) ............................. 8

*Transport Ins. Co. v. Faircloth,*
  898 S.W.2d 269 (Tex. 1995) .................................................................... 14

*Will-Roye Investment Co. II v. Wash. Mut. Bank, FA,*
  142 S.W.3d 393 (Tex.App. – El Paso 2004, no pet.) ................................ 11

## Other Authorities

RESTATEMENT (SECOND) OF TORTS § 551(2) .................................................... 1

W. Page Keeton, et al.,
  *Prosser & Keeton on the Law of Torts*, § 109 (5th ed. 1984) ................... 14

## STATEMENT OF THE CASE

*Nature of Case*    Levi and Michelle McKenzie sued their construction lender, Community National Bank (CNB), for damages arising from a third party builder's defective construction of their home and failure to pay subcontractors. *1 CR 15-34*; *2 CR 366-74.* The McKenzies alleged causes of action against CNB for negligence, breach of the duty of good faith and fair dealing, and fraudulent inducement. *Id.*

*Course of Proceedings*    CNB filed traditional and no evidence motions for summary judgment on all the McKenzies' claims. *2 CR 390-94, 395-450*; *3 CR 451-647.*

*Trial Court's Disposition*    The trial court granted CNB's motions in an order dated May 5, 2014. *6 CR 1221*; *App. A.*

## ISSUES PRESENTED

Did the trial court properly grant CNB's motions for summary judgment?

1.    Are the McKenzies' negligence claims barred by the economic loss rule and estoppel by contract?

2.    Did the absence of a special relationship preclude imposition of an implied good faith duty on CNB?

3.    Were CNB's purported "partial disclosures" sufficiently material and misleading to support the McKenzies' fraudulent inducement claim?

On February 23, 2011, Levi and Michelle McKenzie contracted with J.H. Storey Construction Company, Inc. to build a home. *2 CR 367, ¶ 7.* For purposes of obtaining financing, Justin Haby, J.H. Storey's owner,[1] referred the McKenzies to Community National Bank (CNB) and Mary Mangold, one of CNB's loan officers. *3 CR 591.* Levi met with Mangold in February 2011, and claims Mangold told him that Storey "was a good builder and they had built houses with them in the past." *5 CR 1091.* At the time, CNB had not had any issues or problems with Storey's construction work, nor was CNB aware of any problems or construction work issues for other CNB customers' construction loans related to Storey.[2] *6 CR 1181, ¶ 3.*

The McKenzies and CNB closed on the interim construction loan on March 22, 2011. In the loan documents they signed, the McKenzies acknowledged and agreed that:

- The McKenzies should not sign any document before they read and understood it. *2 CR 421; 3 CR 514.*

---

[1] In this brief, J.H. Storey and Haby will be referred to collectively as "Storey."

[2] The McKenzies criticize CNB for failing to inform them that Storey was in default on his contracts with other homeowners. *Brief of Appellants* at 7. It is undisputed, however, that these other homeowners experienced problems at about the same time as the McKenzies – well after the loan documents were executed. *See 4 CR 830, 837; 5 CR 1064.* Therefore, any failure to disclose this information could not form the basis of the McKenzies' fraudulent inducement claim. *See Ralston Purina Co. v. McKendrick*, 850 S.W.2d 629, 633 (Tex.App. – San Antonio 1993, writ denied) (noting duty to disclose certain matters *before transaction consummated*, citing RESTATEMENT (SECOND) OF TORTS § 551(2)).

- The McKenzies had investigated Storey's background, experience, and reputation.  *3 CR 509, ¶ 4.*

- CNB would not have any responsibility or liability for Storey or the quality of its materials or workmanship.  *3 CR 509, ¶ 4.*

- Quality control of Storey's work was the McKenzies' responsibility.  To ensure the home was constructed in accordance with the McKenzies' wishes, they were to inspect the work or have their own independent inspector review the work in progress.  *2 CR 421.*

- CNB had the right, but not the obligation, to inspect Storey's work during construction, but any inspection by CNB would be solely for its benefit and CNB had no obligation to monitor or control Storey's work.  *3 CR 492.*

- CNB had no obligation, either express or implied, to the McKenzies or third parties to verify that draws Storey requested were actually used to pay for labor or material used in connection with construction of the McKenzies' home.  *3 CR 487.*

- The McKenzies had selected Storey, and assumed all risks in the event Storey failed to pay for all labor and material furnished or otherwise failed to perform.  *3 CR 487.[3]*

The McKenzies admitted they read the loan documents at closing, which took two to three hours.  *5 CR 909, 1007.*  Although those documents clearly place responsibility on the McKenzies to monitor the quality of Storey's work and verify Storey's payments to subcontractors, they now

---

[3] Relevant excerpts from the loan documents are highlighted and attached to this brief as Appendix B.

claim they believed that it was CNB's obligation to ensure that "the money was going to the proper place" – an understanding gained not from the loan documents, but from "other people that had built homes." *5 CR 941.*

Construction commenced shortly after closing, and over the next few months, the McKenzies signed off on thirteen draw requests from Storey, each certifying that the bills and invoices referenced in the requests had been paid. *4 CR 523-83.* Despite these certifications, Storey apparently was not paying subcontractors who worked on the home, and the work that had been performed on the home was defective. *2 CR 368, ¶¶ 11-12.* Consequently, in summer 2011 – after the McKenzies had approved disbursement of almost all construction funds – Storey stopped all work on the home, and in November 2011, the McKenzies locked Storey out. *5 CR 911-12.*

The McKenzies sued J.H. Storey in October 2011, and subsequently filed a criminal complaint against Haby with the Medina County Sheriff's Office. *5 CR 913; 948.* In an effort to accommodate the McKenzies and permit them to resolve their dispute with Storey, CNB gave them several extensions on the note. *2 CR 439 – 3 CR 463.* Yet when the McKenzies settled their lawsuit against Storey for $35,000, they made no effort to pay off their construction loan, but instead sued CNB for negligence, breach of

the duty of good faith and fair dealing, and fraudulent inducement. *1 CR 15-34.* The McKenzies ultimately obtained permanent financing and paid off CNB after filing suit, but persisted in their claims against CNB for unspecified actual damages.

CNB moved for summary judgment, arguing that: (1) the McKenzies' negligence claim is barred by the economic loss rule and estoppel by contract; (2) CNB owes the McKenzies no duty of good faith and fair dealing as a matter of law; and (3) the absence of a duty based on non-disclosure or partial disclosure precluded the McKenzies' fraudulent inducement claim. *2 CR 390-94, 395-411.* The trial court granted CNB's motions and this appeal ensued. *6 CR 1221, 1240.*

## SUMMARY OF THE ARGUMENT

CNB extended interim construction financing to the McKenzies in reliance on their acknowledgment that they had selected and investigated Storey's background, experience, and reputation, and that CNB "will not have any responsibility or liability whatever for [Storey] or the quality of [its] materials or workmanship." *3 CR 509 ¶¶ 1 & 4, 511; App. B.* To that end, the McKenzies signed loan documents in which they agreed that they were responsible for monitoring and controlling the quality of Storey's work and assumed "all risks" in the event Storey failed to pay subcontractors or

4

otherwise failed to perform. *2 CR 421; 3 CR 487, 514; App. B.* The McKenzies apparently neglected to monitor Storey's work in accordance with their agreement, and after the majority of the loan proceeds had been disbursed, they discovered that the work was defective and that certain subcontractors had not been paid. They now attempt to hold CNB responsible for their resulting losses.

It is not the courts' role to protect parties from their own agreements. *Nat'l Prop. Holdings, L.P. v. Westergren*, 58 Tex.S.Ct.J. 204, 208, 2015 WL 123099, *5 (Tex. 2015). But that is precisely what the McKenzies seek in this lawsuit, claiming that CNB is liable based on negligence, breach of an implied good faith duty, and fraudulent inducement because: (1) notwithstanding their acknowledgement that they read and understood the loan documents, CNB failed to advise them of their obligations; and (2) CNB represented that Storey was a "good builder." The trial court properly granted CNB's motions for summary judgment on all the McKenzies' claims because:

- The economic loss rule and estoppel by contract bar their negligence claims;

- The absence of a special relationship between CNB and the McKenzies precludes imposition of an implied duty of good faith and fair dealing; and

5

- CNB's purported "partial disclosures" were neither material nor misleading, and as a matter of law, cannot support their fraudulent inducement claim.

## ARGUMENT AND AUTHORITIES

## I. The McKenzies' negligence claims are barred by the economic loss rule and estoppel by contract.

Negligence actions require proof of: (1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damages proximately caused by the breach. *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009); *Leeder v. Wells Fargo Bank N.A.*, No. 04-13-00380-CV, 2014 WL 1714080, *4 (Tex.App. – San Antonio Apr. 30, 2014, no pet.) (mem. op.). The McKenzies assert that CNB owed them a duty "by virtue of their partial disclosure and representation regarding Mr. Haby and J.H. Storey's reputation and business acumen as a homebuilder."[4] *Brief of Appellants* at 12. Assuming that Texas even recognizes a cause of action for "negligent partial disclosure," the McKenzies' negligence claim is nevertheless precluded by the economic loss rule and estoppel by contract.[5]

---

[4] The only "representation" attributed to CNB did not address Storey's "business acumen." Rather, according to Levi, Mangold simply opined that Storey "was a good builder." *3 CR 591.*

[5] The authorities the McKenzies cite address partial disclosure as the basis for a fraud claim, not a cause of action for negligence. *See Bradford v. Vento*, 48 S.W.3d 749, 755-56 (Tex. 2001) (noting that supreme court has never adopted a general duty based on partial disclosure, but holding that if such a duty existed, evidence did not support jury's finding of fraud); *Holland v. Thompson*, 338 S.W.3d 586, 597-98 (Tex.App. – El Paso 2010, pet. denied) (discussing duty to disclose in the context of a claim for fraud);

6

## A. Economic Loss Rule

The economic loss rule precludes recovery of economic losses in negligence when the loss is the subject matter of a contract between the parties. *Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991); *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986); *Leeder*, 2014 WL 1714080 at *4. To overcome the rule, a claimant must plead and prove either personal injury or property damage as contrasted to mere economic harm. *Strauss v. Ford Motor Co.*, 439 F.Supp.2d 680, 688 (N.D.Tex. 2006) (quoting *Express One Int'l, Inc. v. Steinbeck*, 53 S.W.3d 895, 899 (Tex.App. – Dallas 2001, no pet.)). In this case, the McKenzies have neither pleaded nor presented any evidence that their damages are anything other than economic losses related to their loan agreement with CNB. As such, the economic loss rule precludes their negligence claims as a matter of law.

The McKenzies do not dispute that the economic loss rule applies. Instead, they assert – incorrectly – that CNB waived reliance on the economic loss rule because it did not plead the rule as an affirmative defense. As the Texas Supreme Court has expressly recognized, because the

---

*Ralston Purina*, 850 S.W.2d at 636-37 (finding duty based on partial disclosure sufficient to support fraudulent inducement claim); *Int'l Sec. Life Ins. Co. v. Finck*, 475 S.W.2d 363, 369-70 (Tex.Civ.App. – Amarillo 1971), *rev'd on other grounds,* 496 S.W.2d 544 (Tex. 1973) (discussing duty to speak based on partial disclosure as basis for fraud claim).

existence and amount of damages is part of a plaintiff's cause of action, a defendant is not required to assert the economic loss rule as an affirmative defense. *Equistar Chem., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 868 (Tex. 2007). *See also Tarrant Cnty. Hosp. Dist. v. GE Auto. Serv., Inc.*, 156 S.W.3d 885, 895 (Tex.App. – Fort Worth 2005, no pet.). Rather, in order to avoid summary judgment, it was the McKenzies' burden to plead and present evidence that they sustained personal injury or property damage apart from economic damages. Because they failed to do so, their negligence claims fail as a matter of law.

### B. Estoppel by Contract

Estoppel by contract is a form of quasi estoppel based on the idea that a party to a contract cannot take a position inconsistent with its provisions, to the prejudice of another. *Johnson v. Structured Asset Serv., LLC*, 148 S.W.3d 711, 721-22 (Tex.App. – Dallas 2004, no pet.); *Hawn v. Hawn*, 574 S.W.2d 883, 886 (Tex.Civ.App. – Eastland 1978, writ ref'd n.r.e.). Under the doctrine of estoppel by contract, a party is bound by the terms of his own contract unless it is set aside by fraud, accident, or mistake. *Skinner Custom Homes, Inc. v. Smith*, 397 S.W.3d 841, 846 (Tex.App. – El Paso 2013, pet. denied); *Johnson*, 148 S.W.3d at 722.

8

In this case, the McKenzies admit that they signed the loan documents, and they do not dispute that the terms of those documents preclude their claims in this case. Rather, their sole argument is that CNB failed to establish estoppel by contract because it did not present conclusive proof of fraud by the McKenzies.

Again, the McKenzies misstate Texas law. Unlike equitable estoppel or estoppel in pais, estoppel by contract, as a form of quasi estoppel, requires no showing of a false representation or detrimental reliance. *Fasken Land & Minerals, Ltd. v. Occidental Permian Ltd.*, 225 S.W.3d 577, 593 (Tex.App. – El Paso 2005, pet. denied); *Stuebner Realty 19, Ltd. v. Cravens Rd. 88, Ltd.*, 817 S.W.2d 160, 164 (Tex.App. – Houston [14th Dist.] 1991, no writ). For this reason, the McKenzies' reliance on *Browning's Adm'x v. Atkinson*, 37 Tex. 633 (1872) – which discusses estoppel in pais – is misplaced.

The McKenzies signed loan documents in this case in which they acknowledged they had investigated Storey, and agreed to: (1) inspect Storey's work for quality control; and (2) review Storey's draw requests to ensure that loan proceeds were properly disbursed. *3 CR 509, ¶ 4*; *3 CR 514-15*; *App. B.* In addition, the McKenzies affirmed that any inspection by CNB was for its own benefit, and expressly acknowledged that CNB had no

9

obligation to monitor or control Storey's work for them. *3 CR 492*; *App. B.*
Finally, the McKenzies specifically agreed to "assume all risks in the event
[Storey] fails to pay for all labor and material furnished or otherwise fails to
perform under the Contract." *3 CR 487*; *App. B.* Their own unequivocal
agreement precludes them from shifting their acknowledged
responsibilities (and liability for failure to fulfill them) to CNB.

## II.   The absence of a special relationship between CNB and the McKenzies precludes imposition of an implied duty of good faith and fair dealing.

The McKenzies next argue that summary judgment was improper
because CNB owed them a duty of good faith and fair dealing, and breached
that duty by failing to explain the terms contained in the loan documents
and not advising them to employ legal counsel. The Texas Supreme Court
has consistently held, however, that duty of good faith and fair dealing is
not imposed in every contract, but only in special relationships marked by
shared trust or an imbalance of bargaining power. *Federal Deposit Ins.
Corp. v. Coleman*, 795 S.W.2d 706, 708-09 (Tex. 1990); *English v. Fisher*,
660 S.W.2d 521, 524-25 (Tex. 1983) (Spears, J., concurring). Neither the
relationship between lender and borrower nor between a bank and its
customer is sufficient to give rise to a duty of good faith. *Coleman*, 795

S.W.2d at 709; *Will-Roye Investment Co. II v. Wash. Mut. Bank, FA*, 142 S.W.3d 393, 410 (Tex.App. – El Paso 2004, no pet.).

While acknowledging these well-established principles, the McKenzies insist that a special relationship based on disparate bargaining power imposed an implied good faith duty on CNB because it had superior knowledge of construction financing and of Storey's banking background. But disparity of bargaining power does not occur merely because one party is more sophisticated or occupies a more advantageous bargaining position. *See In re Lyon Fin. Serv., Inc.*, 257 S.W.3d 228, 233 (Tex. 2008) (orig. proceeding) (plaintiff's claim that he was not able to obtain legal advice, did not have formal business school training, and was unaware of contract provision when he signed it insufficient to show disparity of bargaining power); *Nationsbank v. Perry Bros. Inc.*, 68 F.3d 466, *1 (5th Cir. 1995) (not designated for publication) (dominant position of bank to significant disadvantage of borrower insufficient to establish special relationship necessary to implied good faith duty under Texas law).

Rather, a disparity of bargaining power exists only when one party has no real choice in accepting the terms of the agreement. *In re Lyon Fin. Serv., Inc.*, 257 S.W.3d at 232; *Dillee v. Sisters of Charity of Incarnate Word Health Care Sys., Houston, Tex.*, 912 S.W.2d 307, 309 (Tex.App. –

11

Houston [14th Dist.] 1995, no writ). Because the McKenzies failed to present any evidence showing they had no choice but to do business with CNB, no implied duty of good faith and fair dealing can be imposed on CNB and summary judgment on the McKenzies' claim for breach of that non-existent duty was proper.

## III. CNB's purported "partial disclosures" were neither material nor misleading, and as a matter of law, cannot support their fraudulent inducement claim.

Finally, the McKenzies contend that CNB fraudulently induced them to execute the loan documents because CNB failed to disclose that in the past, Storey had received two loans from CNB to cover an overdraft while waiting for payment from a contractor – loans Storey significantly paid down but ultimately was unable to completely pay off. *4 CR 766-67.* The McKenzies admit that generally, no duty of disclosure arises without evidence of a confidential or fiduciary relationship, which does not exist in this case. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998).

Nevertheless, the McKenzies claim that CNB had a duty to disclose based on statements by its loan officer, Mary Mangold, regarding Storey's reputation as a builder:

> Q. Did Ms. Mangold make any statements to you about Mr. Haby's, I guess for lack of a better phrase, reputation as a builder?

12

A.      My understanding in our discussion was that he was a good builder and that he had built several houses in the area and that they had worked with him on several houses and that they were nice houses.

*5 CR 1092.* According to the McKenzies, Mangold's statements constituted a partial disclosure regarding Storey's reputation, which in light of the previous default conveyed a false impression. *See Anderson, Greenwood & Co. v. Martin*, 44 S.W.3d 200, 213 (Tex.App. – Houston [14th Dist.] 2001, pet. denied); *Ralston Purina Co. v. McKendrick*, 850 S.W.2d 629, 634-35 (Tex.App. – San Antonio 1993, writ denied).[6]   As demonstrated below, however, no duty arose in this case because even when considered in light of Storey's previous default, the "partial disclosures" the McKenzies attribute to CNB – which were no more than a matter of opinion – were neither material nor misleading.

To avoid summary judgment on their fraudulent inducement claim, the McKenzies were required to adduce evidence that CNB's alleged partial disclosure was material. *Jones Partners Constr., LLC v. Apopka Plaza Assoc., LLC*, 2006 WL 784892, *5 (N.D.Tex 2006), *aff'd*, 227 Fed.App'x. 420 (5th Cir. 2007) (duty to disclose not triggered where partial disclosures are immaterial).   Pure expressions of opinion are not representations of

---

[6] Although several Texas intermediate appellate courts, including this Court, have recognized a duty based on partial disclosure, the Texas Supreme Court has never adopted such a duty. *Bradford v. Vento*, 48 S.W.3d at 655-56.

material fact, however, and cannot provide a basis for a fraud claim. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of America*, 341 S.W.3d 323, 337 (Tex. 2011); *Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995).

Statements using broad and vague, commendatory language praising services as "good, proper, sufficient, and the like" represent no more than "mere sales talk," rather than statements of material fact. *GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 889 (Tex.App. – Austin 2008, no pet.) (quoting W. Page Keeton, et al., *Prosser & Keeton on the Law of Torts*, § 109 (5th ed. 1984). *See e.g., Jeffcoat v. Phillips*, 534 S.W.2d 168, 171-72 (Tex.Civ.App. – Houston [14th Dist.] 1976, writ ref'd n.r.e.) (representations that doctor was "one of the finest surgeons in Harris County," that plaintiff "should not be afraid of him," that "he had a real good reputation," and that "he didn't have any bad reports against him" expressions of opinion); *Holley v. Central Auto Parts*, 347 S.W.2d 341, 343 (Tex.Civ.App. – Austin 1961, writ ref'd n.r.e.) (statement that tire rim was "a good one" amounted to no more than opinion); *Hawkins v. Campbell*, 226 S.W.2d 891, 896 (Tex.Civ.App. – San Antonio 1950, writ ref'd n.r.e.) (statement that price is a good price for property merely an expression of opinion). In this case, Mangold's alleged statements – that Story was "a good builder" who had built "nice houses" –

14

constitute no more than expressions of her opinion, and thus, cannot support the McKenzies' fraudulent inducement claim.

Summary judgment was proper on the McKenzies' fraudulent inducement claim for the additional reason that the information they believe should have been disclosed was not material to Mangold's opinion that Storey was a "good builder" who built "nice houses." Notwithstanding the McKenzies' mischaracterizations in their brief, Mangold's purported statements did not relate to Storey's "financial reputation" or his "business acumen." And although Storey's default – which was the result of another builder's failure to pay – might have relevance to whether Storey was a good bank customer, it says nothing about Storey's competence as a builder.

The Fourteenth Court of Appeals addressed a similar situation in *Fleming v. Tex. Coastal Bank of Pasadena*, 67 S.W.3d 459 (Tex.App. – Houston [14th Dist.] 2002, pet. denied). In that case, Fleming met with Cord, who convinced Fleming to invest in one of Cord's ventures. *Id.* at 460. To facilitate the investment, Cord told Fleming to purchase a $280,000 CD from Texas Coastal Bank as collateral to secure a loan. *Id.* While the documents were being prepared, Fleming asked the bank's president what he knew about Cord, who told Fleming that Cord generally

15

carried six figures in his account, was a "good customer," and that he "didn't really understand all of Cord's business, but that, obviously, you know, he had good business." *Id.*

Ultimately, the investment failed, the bank foreclosed on Fleming's CD, and Cord was convicted for his involvement in this and other fraudulent investment schemes. *Id.* Fleming sued the bank and its president for fraud based on partial disclosure, alleging that the bank was obligated to tell him that Cord was a new customer, his accounts had frequent returned items, he never took out any loans, he had traveled with the bank's president to Belize in an attempt to start a banking venture, and a grand jury had subpoenaed records from his accounts at the bank. *Id.* at 461. The trial court granted the defendants' traditional and no evidence motions for summary judgment. *Id.*

The court of appeals affirmed based in part on its holding that taking the defendants' partial disclosures as a whole, they were not so misleading as to require further disclosure:

> Fleming admits [the bank president] told him "he didn't really understand all of Cord's business, but that, obviously, you know, he had good business." In this context, no reasonable person could infer that [the bank president] was vouching for the soundness of Fleming's investment. [The bank president's] other comments, standing alone, might have given Fleming a false impression about the length, nature, or quality of Cord's

16

banking relationship, but Fleming was not interested in being his banker.

*Id.* at 462.

The court also held that recognizing a duty under the circumstances would be contrary to public policy:

> [W]e decline to create a new duty of non-disclosure as a matter of public policy in this case because of the Hobson's choice it would create for banks. A policy requiring banks to disclose to one customer the private banking information of another would in many cases violate state and federal law. It would also require banks to discourage one customer from doing business with another, inviting claims for tortious interference with their contractual relations.

*Id.* at 462 (citations omitted).

Similarly, in this case, the information the McKenzies complain was not disclosed relates to whether Storey was a good bank customer, not the quality of his work as a builder. For this reason, the fact that CNB had "special knowledge" of his previous default did not contradict or render misleading Mangold's opinion that he was a good builder. And as in *Fleming*, finding a duty to disclose under the circumstances presented by this case would improperly require banks to disclose a customer's private banking information to another customer. Because neither Mangold's opinion that Storey was a "good builder," nor the unrelated information regarding Storey's previous default, supports the McKenzies' fraudulent

17

inducement claim, the trial court properly granted CNB's motions for summary judgment.

## PRAYER

For these reasons, Appellee Community National Bank requests that the trial court's judgment be affirmed.  Appellee further requests all relief to which it may be entitled, at law or in equity.

Respectfully submitted,

LAW OFFICES OF ELIZABETH G. SMITH
Elizabeth G. Smith
State Bar No. 18577200
6655 First Park Ten, Suite 250
San Antonio, Texas 78213
(210) 731-9177 – Telephone
(210) 731-9130 – Fax
beth@egsmithlaw.com

HOUSTON DUNN, PLLC
Nissa M. Dunn
State Bar No. 14766450
4040 Broadway St., Suite 440
San Antonio, Texas  78209
(210) 775-0880 – Telephone
(210) 826-0075 – Fax
nissa@hdappeals.com


By */s/ Nissa M. Dunn*
Nissa M. Dunn

ATTORNEYS FOR APPELLEE
COMMUNITY NATIONAL BANK

## CERTIFICATE OF COMPLIANCE

In accordance with Texas Rule of Appellate Procedure 9.4, the undersigned certifies that the foregoing brief contains 3,996 words.

/s/ Nissa M. Dunn
NISSA M. DUNN

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing Appellee's Brief has been delivered, pursuant to the Texas Rules of Appellate Procedure, on the 6th day of February, 2015, to the following:

Eric A. Pullen                                        *Via E-service and/or E-mail*
Sarah A. Reyes
PULMAN, CAPPUCCIO, PULLEN
BENSON & JONES, LLP
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
epullen@pulmanlaw.com
sreyes@pulmanlaw.com


                                        /s/ Nissa M. Dunn
                                        NISSA M. DUNN

# A

# Order Granting Motions for Summary Judgment

Cause No. 13-05-21843-CV

| | | |
|---|---|---|
| LEVI and MICHELLE McKenzie, | § | IN THE DISTRICT COURT |
| Plaintiffs | § | |
| vs. | § | 38TH JUDICIAL DISTRICT |
| | § | |
| COMMUNITY NATIONAL BANK, | § | |
| Defendant | § | MEDINA COUNTY, TEXAS |

**FILED**
HOUR 3:03 Pm

**MAY 0 5 2014**

CINDY FOWLER
Dist. Clerk, Medina County, Texas
By _____ Deputy

### ORDER GRANTING COMMUNITY NATIONAL BANK'S NO EVIDENCE MOTION FOR SUMMARY JUDGMENT AND TRADITIONAL MOTION FOR SUMMARY JUDGMENT

On April 7, 2014, came on to be considered Defendant, Community National Bank's ("Bank") No Evidence Motion for Summary Judgment, and Traditional Motion for Summary Judgment against Levi McKenzie and Michelle McKenzie, Plaintiffs herein. The Court, after examining the pleadings timely filed, Defendant Bank's No Evidence Motion for Summary Judgment, Defendant's Traditional Motion for Summary Judgment, Plaintiffs Response to both motions, Defendant's Reply and the summary judgment evidence admitted for consideration, determined that Defendant Community National Bank is entitled to summary judgment as follows:

IT IS ORDERED that Defendant's No Evidence Motion for Summary Judgment, and Traditional Motion for Summary Judgment are GRANTED and Plaintiffs, Levi and Michelle McKenzie take nothing against Defendant, Community National Bank, that all claims asserted by Plaintiffs are denied.

IT IS FURTHER ORDERED that Defendant's request for attorney fees is denied. All relief requested in this case and not expressly granted is denied. This judgment finally

B1210S/Pleadings, McKenzie v CNB/MSJ/OrderMSJ

Page 1 of 2

disposes of all parties and claims and is appealable.

SIGNED on the __5__ day of ~~April,~~ May, 2014.

_____
JUDGE PRESIDING

**APPROVED:**
Law Offices of Elizabeth G. Smith
6655 First Park Ten, Suite 250
San Antonio, Texas 78213
P: 210-731-9177    F: 210-731-9130
Email: beth@egsmithlaw.com

by _____
Elizabeth G. Smith
State Bar No. 18577200
Attorney for Community National Bank, Defendant

**APPROVED:**
Pulman, Cappuccio, Pullen & Benson
2161 NW Military Hwy., #400
San Antonio, TX 78213
P: 222-9494    F: 892-1610
Epullen@pulmanlaw.com

by: _____
Eric A. Pullen
State Bar No. 24007881
Chrissy L. Schwennsen
State Bar No. 24073786
Attorney for Plaintiffs, Levi and Michelle McKenzie

# B

# Excerpts from McKenzie Loan Documents

Owners/Borrowers:  Levi McKenzie Michelle McKenzie
Contractor:
Property:         Lot C County Road 366, Rio Medina, Texas 78066
Lender:           Community National Bank

## Disclosure Statement Required for
## Texas Residential Construction Contract
## Sec. 53.255(B) Texas Property Code

Loan #

**KNOW YOUR RIGHTS AND RESPONSIBILITIES UNDER THE LAW.** You are about to enter into a transaction to build a new home or remodel existing residential property. Texas law requires your contractor to provide you with this brief overview of some of your rights, responsibilities, and risks in this transaction.

**CONVEYANCE TO CONTRACTOR PROHIBITED.** Your contractor may not require you to convey your real property to your contractor as a condition to the agreement for the construction of improvements on your property.

**KNOW YOUR CONTRACTOR.** Before you enter into your agreement for the construction of improvements to your real property, make sure that you have investigated your contractor. Obtain and verify references from other people who have used the contractor for the type and size of construction project on your property.

**GET IT IN WRITING.** Make sure that you have a written agreement with your contractor that includes: (1) a description of the work the contractor is to perform; (2) the required or estimated time for completion of the work; (3) the cost of the work or how the cost will be determined; and (4) the procedure and method of payment, including provisions for statutory retainage and conditions for final payment. If your contractor made a promise, warranty, or representation to you concerning the work the contractor is to perform, make sure that promise, warranty, or representation is specified in the written agreement. An oral promise that is not included in the written agreement may not be enforceable under Texas law.

**READ BEFORE YOU SIGN.** Do not sign any document before you have read and understood it. NEVER SIGN A DOCUMENT THAT INCLUDES AN UNTRUE STATEMENT. Take your time in reviewing documents. If you borrow money from a lender to pay for the improvements, you are entitled to have the loan closing documents furnished to you for review at least one business day before the closing. Do not waive this requirement unless a bona fide emergency or another good cause exists, and make sure you understand the documents before you sign them. If you fail to comply with the terms of the documents, you could lose your property. You are entitled to have your own attorney review any documents. If you have any question about the meaning of a document, consult an attorney.

**GET A LIST OF SUBCONTRACTORS AND SUPPLIERS.** Before construction commences, your contractor is required to provide you with a list of the subcontractors and suppliers the contractor intends to use on your project. Your contractor is required to supply updated information on any subcontractors and suppliers added after the list is provided. Your contractor is not required to supply this information if you sign a written waiver of your rights to receive this information.

**MONITOR THE WORK.** Lenders and governmental authorities may inspect the work in progress from time to time for their own purposes. These inspections are not intended as quality control inspections. Quality control is a matter for you and your contractor. To ensure that your home is being constructed in accordance with your wishes and specifications, you should inspect the work yourself or have your own independent inspector review the work in progress.

**MONITOR PAYMENTS.** If you use a lender, your lender is required to provide you with a periodic statement showing the money disbursed by the lender from the proceeds of your loan. Each time your contractor

Texas Residential Construction Contract Disclosure

1

©Peirson Patterson, LLP.-Arlington, Texas 2004-2009

1617090311 [Doc Id 6473 Rev. 06.24.10]



EXHIBIT

4

L. McKenzie



of them.

4.     Contractor's Representations and Warranties. Contractor represents and warrants that at the time of the assignment of the Contract, (i) Contractor has full right, power and authority to endorse and assign the Residential Construction Note and Contract to Lender; (ii) no Work has commenced nor have any materials been delivered on or to the Property or specially manufactured or prefabricated items been ordered; (iii) no written or oral agreement regarding the construction of all or any portion of the Improvements thereof has been entered into by Contractor or to the best of Contractor's knowledge by any subcontractor; (iv) Contractor has not subordinated the lien and security interest granted under the Contract to any other lien or security interest which may affect the Property; (v) Contractor has not pledged, assigned or otherwise encumbered the Contract or the Residential Construction Note; and (vi) the funds to be advanced hereunder, together with other funds in the Account are sufficient to fully construct the Improvements, pay all expenses necessary for such construction and otherwise discharge contractor's obligations under the contract.

5.     Procedure for Construction Advances. Lender shall have no obligation, either express or implied, to Borrower, or to any third parties, to verify that advances made hereunder are actually used to pay for labor or materials used in connection with the construction of the Improvements. Borrower understands that if amounts properly owing are not actually paid, laborers or materialmen may file liens against the Property. Borrower understands that Borrower has selected the Contractor, and thereby agrees to assume all risks in the event Contractor fails to pay for all labor and material furnished, or otherwise fails to perform under the Contract. The proceeds of the Loan and any funds held in the Account shall be advanced at such times as Contractor has earned a portion of amounts due under the approved Work Schedule or Contract (the "Completed Work"). A written draw request for each advance shall be delivered to Lender at least three (3) business days prior to the date on which such advance is to be made. The draw request shall be in a form acceptable to Lender. If requested by Lender, each such request must be accompanied by pertinent invoices, receipts, certificates, lien waivers and other documents. Lender shall have no obligation to make any advance if, at the time the request for such advance is made, Borrower or Contractor is in default with respect to any provision of this Agreement or of any instrument referred to herein. Each draw request shall be deemed a representation and warranty by Borrower and Contractor that no such default exists. The amount of each construction advance shall be for the items listed in the draw request, as approved by Lender, less the total of all amounts previously advanced and any necessary Retainage (as defined herein) not covered by the funds in the Account. Each amount paid to Contractor by Borrower from the Loan proceeds shall be an advance of the Loan on behalf of Borrower, and shall be delivered directly to Contractor as an installment payment owing to Contractor under the Contract. Unless Borrower authorizes in writing disbursements to be paid directly to the Contractor, all advances shall be evidenced by a check issued jointly to Borrower and Contractor or shall be wire transferred to Borrower's account. The checks\wire transfers shall be delivered by Lender to Borrower based upon progress made in the Work, in such amounts and at such times as Lender, in its discretion, determines as being reasonable based upon inspections made by Lender or its agent from time to time. Borrower understands that the draw request shall be deemed acceptance of the Work completed to date, and concurrence with the amount requested. Unless such individuals have been already paid, Contractor will use the Loan proceeds to pay all subcontractors, artisans, laborers and materialmen contributing to the Work which has been accomplished to date. Borrower agrees to endorse and deliver the check or checks issued by the Lender for Completed Work. Lender has the right as a condition precedent to the issuance of a check to require an inspection of the Work by the inspector or appraiser of its choice, at the expense of the Borrower, and to require a title search of the Property or title policy endorsement. A minimum of three (3) and a maximum of ten (10) inspections may be required by Lender. The expense to the Borrower of each inspection shall not exceed $0.00. Borrower agrees to utilize the checks and wire transfers delivered to it by Lender for delivery to the Contractor strictly in accordance with the provisions of this Agreement. Borrower will not endorse or deliver to Contractor any of the checks received from Lender evidencing the Loan proceeds until the portion of the Work for which each check is to pay has been completed by the Contractor, and until Contractor, has represented to Borrower that it

Residential Construction Loan Agreement - Borrower's Name

3

0858210311 [Doc Id 5650 Rev. 07.07.10]

9. **Right of Inspection.** The Borrower and Contractor shall furnish the Lender with a complete duplicate set of Plans and Specifications. The Lender has the right, but not the obligation, during construction of the Improvements to inspect the same and require to be repaired or replaced, at Borrower's expense, any material or workmanship that does not comply with the Plans and Specifications. Such inspection shall not cost more than $0.00. A minimum of three (3) to a maximum of ten (10) shall be required by Lender. Such inspections shall be deemed to be for the benefit of the Lender only and shall create no liability or responsibility to the Borrower; the parties expressly acknowledge that Lender has no obligation to monitor or control the work for Borrower. Lender's agreement to advance funds under this Agreement is expressly conditioned upon its continuing right to inspect the Property. Lender may inspect the Property at any reasonable time to determine the progress and quality of the Work and the condition of the Improvements, but Lender shall not be liable for the performance or default of any contractor or subcontractor, or for any failure to construct, complete, protect or insure the Improvements or materials, or for the payment of any cost or expense incurred in connection therewith, or for the performance or non-performance of any obligation of Borrower or Contractor; and nothing, including without limitation any disbursement hereunder or the deposit or acceptance of any document or instrument, shall be construed as a representation, warranty, or waiver express or implied, on Lender's part. Irrespective of a default under the Contract or work agreement by Contractor or for its failure to complete or perform all Work required of it under the Contract, Borrower shall have no right to offset, counterclaim or defense against Lender because of any claim Borrower may have against Contractor. The obligations arising under the Contract or Plans and Specifications between Contractor and Borrower are separate and independent of any obligations arising hereunder among the undersigned. Lender may perform any inspection by or through any employee, agent, or independent contractor.

10. **Right of Lender to Complete or Secure.** Borrower and Contractor agree that, if construction of the Improvements is delayed or suspended for a period in excess of fifteen (15) days, or if Contractor fails to supply workmen and materials which are satisfactory to Lender at any time during the progress of the construction, or if Contractor or any other persons engaged in such construction or any part thereof refuses, omits or neglects to supply a quantity of material or workmen necessary to complete the Work within the required time period, or if Borrower or Contractor shall be in default with respect to any provision hereof or any provisions of the instruments attached hereto, Lender may (but is not obligated) and is hereby authorized, in its sole discretion, upon five (5) days written notice to Borrower and Contractor, to proceed with the construction of the Improvements. For these purposes, Lender, and any persons authorized or employed by it, are expressly authorized to enter into and upon said Property and Improvements and take charge thereof, together with all materials, equipment and other personal property thereon and to proceed with the construction of said Improvements, or to require Borrower and Contractor to complete construction, with any such changes, alterations, additions or modifications as may be deemed necessary or expedient by Lender, and to do whatever Lender may, in its sole discretion, deem necessary to insure completion of the construction, all to the end that the Property shall constitute the best practicable security for the Loan. If construction is delayed or suspended, Lender, in Lender's discretion, and without notice to Borrower or Contractor, may take such steps as Lender deems reasonable to secure the Property and Improvements from the elements or intruders. Any costs so incurred shall be at Borrower's expense.

11. **Power-of-Attorney.** Borrower does hereby irrevocably constitute and appoint Lender to be their true and lawful attorney-in-fact for them and in their name to sign any and all draw requests for the advances to be made hereunder, as the Lender may in its sole discretion deem necessary and proper to secure the continuance and completion of said Improvements according to the terms hereof, and to pay all sums necessary for incidental expenses in connection therewith, all of which disbursements and sums shall be considered advances made by Lender to Borrower under the provisions of this Agreement and the Note. Lender shall not be required to make such payments unless in its sole discretion it consents to waive the signing of such draw requests by Borrower and Contractor. Borrower hereby also irrevocably authorizes and empowers Lender to do and perform for them and in their name, place and stead all actions which Lender may in its judgment deem necessary and proper to be done to

Residential Construction Loan Agreement - Borrower's Name

8

0858210311 [Doc Id 5650 Rev. 07.07.10]

Lender:        Community National Bank
Borrower:    Levi McKenzie and wife, Michelle McKenzie
Property:      Lot C County Road 366, Rio Medina, Texas 78066

# Residential Construction Loan
# Borrower's Affidavit

Loan # 35803880

BEFORE ME, the undersigned authority on this day personally appeared the undersigned (hereinafter called "Borrower"), personally known to me to be the person whose name is subscribed hereto, and upon having been lawfully sworn upon oath deposes and states in connection with a transaction involving the construction of certain improvements on the property ("Property") described above:

Borrower hereby warrants and represents (which warranties, covenants, agreements and representations shall survive the making of any and all advances) as follows:

1. **Reliance.** The Borrower has been advised by the Lender that Lender is relying upon the recitals herein contained in connection with, among other things, negotiating and establishing the interest charges to Borrower in connection with a mortgage loan ("Loan"), and that this Affidavit has been executed by Borrower in connection with that mortgage loan, and that this Affidavit has been executed by Borrower for the purpose of (i) inducing Lender's reliance on the recitals herein contained and (ii) inducing Lender to advance funds under the Residential Loan Agreement ("Construction Loan Agreement") executed by Lender, Borrower and Contractor to be dated as of funding, which funds will finance the construction of certain Improvements.

2. **Title.** Borrower is, or will be at the time of closing, the fee simple owner of the Property. The Property is the same as the property described in the Deed of Trust securing the note (which evidences the Loan) executed by Borrower to Lender, both dated the same date as this Affidavit. There are no liens, claims or charges against the Property, other than those that are allowed in the loan documents, or that have been previously approved and agreed to by Lender.

3. **No Work Performed** No work of any kind (including the destruction or removal of any existing improvements, site work, clearing, grubbing, draining or fencing of the land) has been commenced or performed on the Property, no materials or supplies have been delivered to the Property, and no specially manufactured or prefabricated items have been ordered that are to be used in the construction of the Improvements by or for Borrower.

4. **Selection of Contractor.** Borrower acknowledges that Borrower has selected and investigated the background, experience and reputation of all architects, engineers and contractors who will furnish labor, material or other services for the construction of said improvements and that Lender will not have any responsibility or liability whatever for such persons or for the quality of their materials or workmanship.

5. **No Previous Written or Oral Contracts.** Prior to signing and acknowledging of the Mechanic's Lien Contract ("Contract") and the Deed of Trust renewing and extending such contract, no written Contract regarding the construction of all or any portion of the improvements to be constructed by or for Borrower on the Property has been recorded or filed for record in the Office of the County Clerk of the county where the Property is located, and no affidavit regarding any oral contract for the construction of all or any portion of the improvements to be constructed by or for Borrower has been recorded or filed for record in

Residential Construction Loan Borrower's Affidavit (Borrower's Name)

1

©PeirsonPatterson, LLP.-Arlington, Texas 2004-2009
0858210311 [Doc Id 5657 Rev. 06.24.10]



EXHIBIT
**14**
L. McKenzie 9/23/13



furnish all such bonds, lien waivers surveys, releases and other documents as Lender may deem necessary or may request from time to time.

11. Borrower's Financial Status. That there are no pending lawsuits, judgments or garnishments against Borrower which may in any way impair the ability of Borrower to fully perform all obligations provided in the Contract or Construction Loan Agreement, or which may affect the Property, Contract, or Security Instrument. All warranties, representations and certifications made, and all information and material submitted or caused to be submitted to Lender in connection with the Loan are true and correct, and there have been no material changes in the conditions affecting any of such warranties, representations, certifications, information or material prior to the date of this Affidavit.

12. Covenants of Borrower. The execution and delivery of all documents executed or delivered by or on behalf of Borrower and pertaining to the Loan have been duly authorized and approved by the party executing such documents and constitute the valid and binding obligations of Borrower enforceable in accordance with their respective terms, and the payment or performance thereof will be subject to no offsets, claims or defenses of which Borrower is aware. Borrower shall perform all obligations under the Contract, Note and Security Instrument, and promptly pay when due, from the proceeds of the Loan, all costs, charges and expenses, incurred in connection with the construction of improvements. Borrower shall keep the Property free and clear of any and all liens other than the Mechanic's Lien Contract as renewed and extended by the Security Instrument, and protect the Property and improvements from events and circumstances which would cause said Property or improvements to decrease in value.

13. Reimbursement. To reimburse lender for all expenses of any kind which may be incurred by Lender in connection with or arising out of the Loan, and that Lender may deduct from any advance to be made, any amount necessary for the payment of any unpaid interest owing to Lender or any fees, expenses, charges, liens, or encumbrances relating to the construction of the improvements or upon the Property, or any other amounts necessary for the payment of the cost of constructing the improvements, and all sums so deducted or applied shall be deemed advances under the Loan Agreement.

14. Indemnification. That Borrower herewith indemnifies and holds Lender harmless from any and all actions, claims, demands, damages, costs, expenses, and other liabilities, including, but not limited to, attorney's fees, which Lender may incur that in any way relate to or arise out of the construction of the Improvements.

Borrower understands that this Affidavit is made for the purpose of inducing the Lender to advance the money pursuant to the terms of the Loan documents, and the Lender is relying upon the truth and accuracy of the statements made in this Affidavit in advancing such loan proceeds. Further, Borrower agrees to indemnify and save Lender harmless against costs, damages, attorney's fees, expenses and liabilities which it may incur or sustain in connection with the incorrectness of any of these representations or any court action arising therefrom and will pay the same upon demand. Borrower further agrees to indemnify and save Lender harmless from any claims by or against the Contractor or any subcontractors or material suppliers.

EXECUTED this ___22___ day of _March_ 20_11_.

Signature: Levi McKenzie      Date: 3/22

Signature: Michelle McKenzie      Date: 3-22-11

Residential Construction Loan Borrower's Affidavit (Borrower's Name)

3

©PeirsonPatterson, LLP.-Arlington, Texas 2004-2009
0858210311 [Doc Id 5657 Rev. 06.24.10]

Lender:        Community National Bank
Borrower:      Levi McKenzie and wife, Michelle McKenzie
Contractor:    J H Storey Construction, Inc.
Property:      Lot C County Road 366, Rio Medina, Texas 78066

## Disclosure Statement Required for
## Texas Residential Construction Contract
## Sec. 53.255(B) Texas Property Code

Loan # 35803880

KNOW YOUR RIGHTS AND RESPONSIBILITIES UNDER THE LAW. You are about to enter into a transaction to build a new home or remodel existing residential property. Texas law requires your contractor to provide you with this brief overview of some of your rights, responsibilities, and risks in this transaction.

CONVEYANCE TO CONTRACTOR NOT REQUIRED. Your contractor may not require you to convey your real property to your contractor as a condition to the agreement for the construction of improvements on your property.

KNOW YOUR CONTRACTOR. Before you enter into your agreement for the construction of improvements to your real property, make sure that you have investigated your contractor. Obtain and verify references from other people who have used the contractor for the type and size of construction project on your property.

GET IT IN WRITING. Make sure that you have a written agreement with your contractor that includes: (1) a description of the work the contractor is to perform; (2) the required or estimated time for completion of the work; (3) the cost of the work or how the cost will be determined; and (4) the procedure and method of payment, including provisions for statutory retainage and conditions for final payment. If your contractor made a promise, warranty, or representation to you concerning the work the contractor is to perform, make sure that promise, warranty, or representation is specified in the written agreement. An oral promise that is not included in the written agreement may not be enforceable under Texas law.

READ BEFORE YOU SIGN. Do not sign any document before you have read and understood it. NEVER SIGN A DOCUMENT THAT INCLUDES AN UNTRUE STATEMENT. Take your time in reviewing documents. If you borrow money from a lender to pay for the improvements, you are entitled to have the loan closing documents furnished to you for review at least one business day before the closing. Do not waive this requirement unless a bona fide emergency or another good cause exists, and make sure you understand the documents before you sign them. If you fail to comply with the terms of the documents, you could lose your property. You are entitled to have your own attorney review any documents. If you have any question about the meaning of a document, consult an attorney.

GET A LIST OF SUBCONTRACTORS AND SUPPLIERS. Before construction commences, your contractor is required to provide you with a list of the subcontractors and suppliers the contractor intends to use on your project. Your contractor is required to supply updated information on any subcontractors and suppliers added after the list is provided. Your Contractor is not required to supply this information if you sign a written waiver of your rights to receive this information.

---

Texas Residential Construction Contract Disclosure

1

©PeirsonPatterson, LLP.-Arlington, Texas 2004-2009

0858210311 [Doc Id 3066 Rev. 06.24.10]



EXHIBIT
15
L.McKenzie

